# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT

OF THE

# STATE OF UTAH

*(Continued from Volume 47)*

STATE ex rel. FERRY v. CORINNE DRAINAGE DIST.
OF BOX ELDER COUNTY et al.

No. 2899.   Decided March 27, 1916.   (156 Pac. 921.)

1. DRAINS—DRAINAGE DISTRICT—LEGISLATIVE ESTABLISHMENT.   The Legislature may provide by law for the creation of drainage districts.[1]   (Page 5.)

2. EMINENT DOMAIN—DRAINAGE DISTRICT—TAKING PROPERTY WITHOUT COMPENSATION.   Drainage Act (Laws 1913, c. 95), Section 3, provides that where petition is presented to the board of county commissioners for the creation of a drainage district, the clerk of the county shall give notice by publication.   Section 5 declares that the board shall hear the petition and may adjourn the·hearing from time to time, so that all parties whose land may be damaged or benefited may appear and contest the necessity or utility of the work, and that commissioners shall be appointed, who shall be known as the board of supervisors, who shall lay out and construct the work and levy a tax on the land, subject to approval of the board of county commissioners. Section 6 provides for appeal from the order of the county commissioners, while Sections 7, 14 and 16, respectively, fix the oath of the members of the board of supervisors, prescribe their duties, and require them to make assessments for prosecuting the work, etc.   *Held*, that the act clearly disclosed that it did not contemplate the taking of property without compensation. (Page 5.)

[1] *Argyle* v. *Johnson*, 39 Utah 500, 118 Pac. 487; *Lundberg* v. *Irrigation District*, 40 Utah 83, 119 Pac. 1039.

Vol. 48—1

3. TAXATION—UNIFORMITY—DRAINS. CONST., ART. 13, Section 2, declares that all property in the state not exempt shall be taxed in proportion to its value, while Section 3 provides for uniform and equal taxation and assessment. One complaining against the creation of a drainage district attacked the drainage law, on the ground that it provided for the taxation of the lands on the acreage basis, exclusive of improvements. *Held*, that as the drainage law provided, not for taxes, but for special assessments, it was not invalid as preventing uniformity and equality of taxation. (Page 9.)

Original proceeding by the State, on relation of John Y. Ferry, for a writ of Prohibition against the Corinne Drainage District of Box Elder County, and others.

WRIT DENIED.

*C. R. Hollingsworth* for plaintiff.

*Gustin, Gillette & Brayton* for defendants.

McCARTY, J.

This is an original proceeding for a writ of prohibition against the Corinne drainage district in Box Elder County, Utah, and the supervisors of the district, to prohibit the sale of bonds of the drainage district in the sum of $75,000, and to prevent the threatened levy of taxes, upon the lands included in the district, to pay the running expenses of the district and to build dams and ditches therein.

The proceeding involves the constitutionality of the Utah Drainage Act, being chapter 95, Laws Utah 1913, as amended by chapter 114, Laws Utah 1915, and the regularity of the creation of the Corinne drainage district and the legality of the proposed bond issue and the levy and assessment of certain drainage taxes and assessments.

It is, in substance, alleged in the petition for a writ that the petitioner is a freeholder and taxpayer within the boundaries of the Corinne drainage district; that on June 1, 1914, one—

"W. M. Buswell, and a large number of others, as petitioners, who were more than a majority of the owners of title, and evi-

dences of title, of the lands within the then proposed drainage
district, and who owned and controlled a major portion of the
lands to be reclaimed, benefited, and included within the dis-
trict, filed with the clerk of Box Elder County, Utah,  *  *
*  their petition, praying for the creation of a drainage dis-
trict under chapter 95, Laws Utah, 1913.''

It is further alleged in the petition that the county clerk
gave due notice of the hearing upon the petition, which hear-
ing was set for April 19, 1914; that a hearing was had on said
date upon the petition and the objections filed thereto, before
the county commissioners; that the county commissioners
made findings that the organization of the drainage district
would be useful for the drainage of the land included therein
for agricultural and sanitary purposes, and conducive to the
public health and welfare, and recited the making of an order
and resolution by the county commissioners, purporting to
create the drainage district in question, and appointing the
supervisors thereof, and the proclamation proclaiming the or-
ganization of the district.  It is further recited that the
county commissioners found that the land would be benefited
by the system proposed for the drainage of the land within the
district; also that thereafter, on the 27th of April, 1915, the
supervisors qualified and entered upon their duties; that the
supervisors engaged a competent engineer, and had a survey
of the land, within the district, made; that on the 19th day
of June, 1915, after receiving the report of the engineer, and
after making an estimate and computation of the actual bene-
fits and damages which would inure to each tract of land
within the district by reason of the creation of the same and of
the cost of the construction of the proposed district improve-
ment, wherein it was determined and found that the cost of
such proposed work with the incidental expenses would be ap-
proximately $175,000, and that no damages would inure by
reason of the construction of the drainage system, and that the
aggregate amount of benefits which would accrue to the lands
of the district would be in excess of $500,000, the supervisors
made and filed with the county commissioners their report, as
required by section 14, chapter 95, Laws Utah, 1913; also that
the board of county commissioners, on the 21st day of June,

1915, made and entered an order and resolution, including certain other lands within said district, and also made and adopted a resolution and order, adopting the report of the said supervisors, to the effect that the drainage system and proposed work was, in all respects, feasible and practical, and ratifying and confirming the resolution of the supervisors.

The petition further alleges that on the 19th day of June, 1915, the board of supervisors adopted a resolution to issue bonds of the drainage district in the sum of $175,000, payable in not less than ten nor more than twenty years, with interest at not more than seven per cent. per annum, and also requesting the board of county commissioners to call a special election to vote upon the question of issuing the bonds; that on June 21, 1915, the county commissioners adopted a certain resolution, calling said special election and ordering notice of the time and place of the holding of the same to be given, and fixing the date of the election for July 23, 1915; that said election was held, and on July 26, 1915, the county commissioners canvassed the returns and declared that eighteen votes had been cast in favor of issuing the said bonds, and there had been no votes cast against such issuance, and that the county commissioners adopted a resolution or order that the bonds had been duly and affirmatively voted upon, and that the issuance thereof was legally authorized.

It is further alleged in the petition that on the 29th day of October, 1915, previous efforts to sell and dispose of the bonds and to obtain satisfactory bids for doing the construction work and furnishing the necessary material being unsuccessful, the supervisors adopted a resolution that new advertisements be made, calling for bids for the construction work and the furnishing of material and for the sale of the bonds; that notice by advertisements was given; that on November 27, 1915, certain bids for the construction work, the furnishing of the required material, and for the sale of the bonds were presented, considered, and contracts awarded for the work, for the purchase of the material, and for the sale of the bonds.

It is also alleged in the petition:

"That the said board of supervisors, as hereinbefore more fully appears, now threaten to, and are about to, sell and dis-

pose of the bonds of said drainage district in the aforesaid sum of $175,000, and to place same in the hands of innocent holders thereof, and likewise threaten to levy taxes upon the lands included in the proposed district, and upon the lands of the petitioner, both those lands of your petitioner within said district as originally proclaimed, and also those lands thereafter purported to be had by said board of county commissioners thereof, said taxes to be levied and collected to pay the running expenses of said district and to build drains and ditches therein, although your affiant has demanded of the said defendants, and each of them, that they desist and refrain from selling and disposing of said bonds, and from the levying of any of said taxes whatsoever; and that unless prohibited from so doing, all of these acts complained of, the said defendants will do and perform the same, to the great and irreparable injury of your petitioner.''

Defendants demurred to the petition, and also filed an answer thereto. By the answer defendants admit all of the foregoing allegations and statements of the petition, except that they deny that the doing of the work and the acts therein mentioned will result in injury to the petitioner or to any one else.

The whole controversy between the parties is before us upon the petition and application for the writ and defendants' demurrer and answer thereto.

Petitioner assails the drainage act as amended on the ground that it ''allows the taking of private property without due process of law and without compensation.'' That the Legislature may provide by law for the creation of drainage districts is no longer an open or debatable question.     1, 2
In the case of *Argyle et al.* v. *Johnson*, 39 Utah 500, 118 Pac. 487, we held the former drainage act (Comp. Laws 1907, p. 395) to be fatally defective for the reason that no provision was made therein whereby owners of the land included in a drainage district were given an opportunity to be heard before some competent tribunal, prior to the time the lien on the land for delinquent taxes and assessments became irrevocably established, on the question of whether the lands are benefited by the drainage district, and, if so, whether the assess-

ments are fair and just. But we also held that it was within the province of the lawmaking power to provide, by appropriate legislation, for the creation of drainage districts. This doctrine is reaffirmed in the case of *Lundberg* v. *Irrigation District*, 40 Utah 83, 119 Pac. 1039. Authorities upholding the validity of legislative acts of this character are cited in the opinions mentioned, to which we again invite attention. In 1913 the Legislature, for the purpose, evidently, of curing the defect in the law pointed out in the Argyle case, passed the drainage act now under consideration. Section 3 of that act provides, in part, that where a petition is presented to the board of county commissioners for the creation of a drainage district—

"the clerk of said county shall cause three (3) weeks' notice of the presentation and filing of such petition to be given addressed to all persons interested, by posting notices  *  *  * and also by publishing a copy thereof at least once a week for three successive weeks in some newspaper or newspapers published in the county in which the district is proposed to be formed.  *  *  *  Such notice shall state when (and where) said petition was and is filed; the starting point or points, route or routes, terminal or termini, and general description of the proposed work  *  *  *  and name of the proposed drainage district, and at what meeting of said board that petitioners will ask a hearing of said petition.  *  *  *."

Section 5, among other things, provides:

"When such petition is presented, the said board of county commissioners shall hear the petition, and may adjourn such hearing from time to time, not exceeding four weeks in all. On the hearing of any petition filed under the provisions of this chapter, all parties through or upon whose land any of the proposed work may be constructed, or whose land may be damaged or benefited thereby, may appear and contest the necessity or utility of the proposed work, or any part thereof, and the contestants and petitioners may offer any competent evidence in regard thereto.  *  *  *  If the commissioners, after hearing any and all competent evidence that may be offered  *  *  *  for and against the said petition.  *  *  *  And if it shall further appear  *  *  *  that the proposed drain or

drains, ditch or ditches, or other works, is or are necessary or will be useful for the drainage of the lands proposed to be drained thereby for the agricultural or sanitary purposes, or conducive to the public health or welfare, the commissioners shall so find and appoint three (3) competent persons, who shall be known as a board of supervisors, and the term of office shall be for three years, except, however, that the term of office of the first appointees shall be as follows (giving the term of each) each of whom shall hold his office until his successor is appointed, as hereinafter provided, and it shall be their duty to lay out and construct such proposed work, and to levy a tax upon the lands in said drainage district, subject to the approval of the board of county commissioners, as herein provided. * * * And if the said board of county commissioners shall find that the establishment and creation of such drainage district will be a benefit as hereinbefore set forth, that the said board shall within ten days, proclaim such district or districts created, and that such proclamation shall be published,'' etc.

Section 6 provides that an appeal from the order of the — county commissioners creating and organizing the drainage district—

"may be made to the district court in the county in which said district is situated. * * * The procedure in said appeals shall conform to the Civil Code as nearly as may be, but no action shall be commenced or maintained, or defense made affecting the validity of the organization, unless the same shall have been commenced or made within six months after the making and entering of said order."

Section 7 provides that the board of supervisors, before entering upon the duties of their office, shall take and subscribe to an oath to faithfully discharge the duties of their office without favor or partiality, and shall execute an official bond in such sum as may be fixed by the board of county commissioners. Section 14 prescribes in detail the duties of the board of supervisors respecting the examination of the lands proposed to be drained and provides for an inquiry whether the starting points, routes and termini of the proposed work and the proposed location thereof is or are in all respects proper and

feasible; the probable costs of the work mentioned in the petition including all incidental expenses; what lands will be injured by the proposed work and the probable amount of damage such lands will sustain; what lands will be benefited by the construction of the proposed work and whether such benefits will equal or exceed the cost of the work. Section 16 provides:

"The board of supervisors shall, on or before the first Monday of February of each year, prepare a statement and estimate of the amount of money to be raised by taxation within said district for the purpose of constructing canals, drains, drain ditches, and other works, and maintaining the same paying the interest upon the bonded indebtedness of the district; creating a sinking fund for redeeming such bonds; and for the purpose of maintaining and repairing drainage canal, flumes, conduits, bridges, culverts, and other works within said district; and for the management and control of such drainage system; and shall assess the entire amount needed in each year against all of the land within said district in proportion to the benefits resulting to each tract of land by the construction and maintenance of such drainage system; the said board of supervisors shall view each tract of land within the district, and shall carefully consider all of the damages and benefits that each particular tract of land will receive from the construction and maintenance of such drainage system, and assess each tract of land in accordance with the benefits received by it, making proper allowance for damages if there be any. After such assessment is made up, the secretary of the board of supervisors shall transmit the same to the board of county commissioners, and the board of county commissioners shall cause notice to be sent by mail to each landowner in the district of the amount of tax assessed upon the land owned by him within the district; and stating therein the time and place when the board of county commissioners shall meet as a board of equalization to hear and determine complaints made against such assessments. The board of county commissioners shall sit as a board of equalization of district drainage taxes and shall equalize and fully determine the assessments to be made and levied upon each tract within the district, at the time and

in the manner provided by law for equalizing state and county taxes and shall thereupon certify the same to the county auditor of the county within which such district is located; the county auditor shall enter the same in the tax rolls of the county; and it shall be the duty of the county treasurer to collect such taxes at the time and in the same manner that the said county taxes are collected.''

The foregoing sections of the act, and the other provisions thereof,. to which we have referred, clearly obviate and overcome the defects in the law as passed in 1907, and pointed out in the Argyle opinion.

The most serious objection urged by plaintiff against the validity of the drainage law, quoting from his brief is that:

"The act provides for the taxation of the lands on an acreage basis * * * (and) provides for the taxation of the lands within a drainage district exclusive of improvements thereon, contrary to and violative of sections 2, 3, and 10 of article 13 of the Utah Constitution.''

Section 2 provides that:

''All property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law,'' etc.

Section 3 in part provides that:

''The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all property in the state, according to its value in money, and shall prescribe by general law such regulations as shall secure a just valuation for taxation of all property, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property.''

There is a well-recognized distinction between a tax imposed for state, county and municipal purposes and a special assessment levied for local improvements. The one is made for revenue from which no special benefits are derived and the other is for local improvement the benefits of which to the land assessed is equal to or greater than the cost of such improvement. This distinction is recognized in the Lundberg case. We there say:

State ex rel. Ferry v. Corinne D. D. of Box Elder Co. et al., 48 Utah 1.

"In adopting the constitutional provisions referred to, it was not intended that it should apply to special assessments. The assessment objected to in this case is not one made under this constitutional provision, but is what is usually denominated a 'special assessment,' based upon benefits accruing to the land which is assessed."

In 9 R. C. L. 651, 652, it is said:

"That the Legislature has power to permit special assessments for local improvements, such as drainage, is fully established by the authorities. Such assessments are not prohibited by constitutional provisions that taxes shall be uniform on the same class of subject within the territorial limits of the authority levying the tax. They are a species of taxation peculiar in nature and subject to special rules. They are not taxes in the ordinary meaning of that term, but are payments under compulsion as compensation for direct benefits conferred."

And again, on page 653:

"The foundation of the right to levy assessments is the particular benefit received by the land assessed."

This doctrine is based on the same principle that upholds the right to levy assessments for the construction of sewers and the paving of streets and sidewalks.

Counsel for petitioner has raised and discussed many grounds of objection to the law under consideration other than those we have mentioned. For us to intelligently discuss each objection, it would be necessary to incorporate in this opinion practically the entire drainage act, which, as amended in 1913, covers approximately 22 pages of the Session Laws of 1913. This would require more time and space than we feel justified in devoting to one opinion. We have, however, examined the objections raised, and are of the opinion that none of them can, upon legal principles, be upheld.

We are of the opinion, and so hold, that the drainage act in question is a wholesome and valid law; and the admitted facts show that the law in the present instance has been scrupulously followed and adhered to in every particular.

The writ is denied, defendants to recover their taxable costs.

STRAUP, C. J., and FRICK, J., concur.