ELKINS et al. v. MILLARD COUNTY DRAINAGE DIST. NO. 3 et al. (SIPFLE et al., Interveners).

No. 5013. Decided December 12, 1930. (294 P. 307.)

Robinson & Robinson, of Provo, for plaintiffs.

Tangren & Crafts, of Delta, for defendants.

Soule & Spalding, of Salt Lake City for interveners.

ELIAS HANSEN, J.

This is an original proceeding in this court whereby the plaintiffs, who are landowners within the defendant drainage district, seek a writ of prohibition to prohibit the officers of the drainage district and the county Assessor of Millard county, Utah, from further proceeding in the levy and collection of taxes for drainage purposes upon the lands within the drainage district. Upon plaintiffs' petition supported by an affidavit of one of the plaintiffs a temporary order was issued directing that the defendants refrain from all further proceedings respecting the levying and collection of taxes for drainage purposes upon the lands within the district until the further order of this court, and also directing that the defendants appear before this court and show cause why the temporary order should not be made permanent. The defendant J. Leo Stott, county assessor of Millard county, filed what he called a disclaimer wherein he alleges that he is merely a ministerial officer and has no interest in the proceeding except to perform his duties as required by law. The defendant drainage district and its supervisors appeared and demurred to plaintiffs' petition and affidavit upon the ground that the facts alleged by plaintiffs do not

entitle them to the relief prayed, or to any relief whatever. Upon application, A. A. Sipfle, Sherwood Green and George S. Ingraham were granted leave to intervene in the cause. They are the owners and holders of the major part of claims against the defendant drainage district which in the aggregate exceed $1,700,000. They demurred to the plaintiffs' petition and affidavit and also filed an answer thereto. Their demurrer is founded upon the ground that plaintiffs' allegations are insufficient to entitle them to the relief prayed, or to any relief whatever. In their answer they admit some of the allegations of plaintiffs' petition and affidavit, other allegations are denied and additional facts deemed pertinent to the cause are set out. They pray for an order of this court denying the writ and directing the defendants to proceed with the levy and collection of the taxes which form the subject-matter of this controversy. All of the parties have entered into a written stipulation and filed the same, wherein the facts deemed material to this cause are recited in considerable detail and the parties have agreed that such are the facts. The parties are thus divided upon questions of law and not upon the facts. The plaintiffs seek to permanently prohibit the defendants from collecting taxes upon the lands within the district because as stated in their brief:

(1) "That section 2055, chap. 41, 'Drainage Districts' Session Laws of Utah 1919, and the tax herein sought to be levied under it are unconstitutional and void, contrary and repugnant to section 7, art. 1 of the Constitution of the state of Utah, in that it deprives or attempts to deprive these plaintiffs and other landowners within said district of their property without due process of law. (2) That said section and chapter and the tax herein sought to be levied are unconstitutional and void, contrary to and repugnant to section 18, article 1 of the Constitution of the state of Utah, in that the said section and the taxes purported to be levied thereunder impair the obligation of the contract existing between the defendant drainage district and these plaintiffs and other landowners within said district. (3) That said section and chapter and the taxes sought to be levied thereunder are further unconstitutional and void, contrary to and repugnant to section 22, article 1, of the Constitution of the State of Utah, in that

they take or attempt to take private property of these plaintiffs and other landowners with said district for a public use without just compensation."

The stipulated facts show that the defendant drainage district was organized on November 13, 1917, under and pursuant to title 26, Drainage Districts, Comp. Laws Utah 1917, § 2040 et seq. The provisions of that law were strictly complied with in the organization, in the assessment of benefits to the land, in the bond elections, and in the sale and issue of bonds of the defendant drainage district. There are 43,371.89 acres of land within the district. The total assessed benefits of land within the district as found and finally determined by the county commissioners of Millard county, Utah, is the sum of $2,536,006.73. The benefits assessed to the land within the district vary from $15 to $70 per acre. The outstanding obligations of the district consist of: A judgment founded upon the bonds of the district in the sum of $354,756; bonds in the sum of $1,200,-000, together with accrued interest thereon, and tax anticipation notes in the sum of $200,000. The judgment is wholly unpaid. Some of the bonds of the district were issued in 1918, some in 1919, and some in 1921. Of the outstanding bonds $485,000 thereof have matured, and an additional $85,000 will mature on August 1, 1930. The tax anticipation notes matured on March 1, 1929. Since about the year 1926 the defendant drainage district has not collected enough taxes to pay the semiannual interest on its outstanding bonds and from year to year the district has issued and sold tax anticipation notes to pay such interest. The whole of the $200,000 tax anticipation notes were issued to pay matured interest coupons on the bonds of the district. In order to raise funds to apply on the obligations of the district, and to secure money to meet the expenses of supervision and maintenance of the district, the board of supervisors of the district on February 28, 1930, passed a resolution whereby they levied a tax of 8 per cent of the total benefits assessed to the land within the district. The reso-

lution so passed directs that the taxes so levied shall be used for the following purposes:

"Interest on bonded indebtedness and tax anticipation notes, $113,-345.55; being .047 of total levy. Supervision and maintenance, $12,-058.04, being .005 of total levy. Sinking fund, $38,585.72, being .016 of total levy. Fifteen per cent to cover possible delinquencies and incidentals, $28,939.28, being .012 of total levy."

To better understand the questions of law that divide the parties it may be of aid to call attention to various provisions of our drainage law as it existed at the time the defendant drainage district was organized. The steps necessary to be taken in the organization of a drainage district under the law as it was at the time the drainage district was organized (and with some minor changes under the present law) are as follows: A petition signed by a majority of the landowners who own not less than one-third of the land or by one-third of the landowners who own the major portion of the land within the proposed district shall be presented to the board of county commissioners of the county in which the land to be drained, or a major portion thereof, is located. The board of county commissioners shall then set a time and place for the hearing of the petition. Notice of such hearing shall be given for at least three weeks " 'to all persons interested,' by posting notices thereof at the door of the courthouse of the county or counties in which the district is situated, and in at least three of the most public places in such proposed district, and also by publishing a copy thereof at least once a week for three successive weeks in some newspaper or newspapers published in the county in which the district is proposed to be formed, and if any portion of said proposed district lie within another county or counties, then said petition and notice shall be posted as above provided or published in a newspaper published or having a general circulation in each of said counties. * * * If any of the landowners of said district are non-residents of the county or counties in

which the proposed district will lie, the petition shall be accompanied by an affidavit, giving the names and places of residence of such non-residents, if known, and if unknown, stating that, upon diligent inquiry, their places of residence cannot be ascertained; and the clerk shall send a copy of the notice aforesaid to each of said non-residents whose residence is known within three days after the first publication of the same." Comp. Laws 1917, § 2042. Upon the day set for the hearing, or a day to which the hearing is adjourned, the board of county commissioners shall hear all interested parties desiring to be heard as to the necessity or utility of the proposed work of draining the lands within the proposed district. The board of county commissioners are empowered to exclude lands from the proposed district that will not be benefited by drainage, and may include lands within the proposed district upon application of the owner whose lands will be benefited by the proposed drainage district. If the board shall determine that the petition is signed by the required number of landowners and that the land within the proposed district will derive from drainage, a benefit in excess of the cost of drainage, then the board shall proclaim such district created and appoint three landowners within the district to act as supervisors thereof. Within ten days after the district is created the proclamation creating the district shall be posted in at least three public places within the county or counties where the district is situated, one of which notices must be posted within the district, or published in some newspaper of general circulation published in the county or counties in which the district is situated. Any interested person dissatisfied with the order creating the drainage district may appeal to the district court of the county in which the district is situated and there have such order reviewed. The members of the board of supervisors shall take an oath of office and furnish a bond in such sum as shall be fixed by the board of the county commissioners. Immediately after their appointment the board of super-

visors shall make an examination of the land within the district and determine:

"1. If drainage and levee work as proposed in the petition, whether the starting points, routes, and termini of the proposed work and the proposed location thereof is or are in all respects proper and feasible; and if not, what is or are so;

"2. The probable cost of the work mentioned in the petition, including all incidental expenses, and the cost of the proceedings therefor;

"3. The probable annual cost of keeping the same in repair after the work is completed;

"4. What lands will be injured by the proposed work, and the probable aggregate amount of all damages such lands will sustain by reason of the laying out and construction of such work;

"5. What lands will be benefited by the construction of the proposed work, and whether the aggregate amount of benefits will equal or exceed the cost of constructing such work, including all incidental expenses, costs of proceedings, and damages;

"6. Whether the proposed district as set out in the petition filed will embrace all the lands that may be damaged or benefited by the proposed work; and if not, to report what additional lands will be so affected." Comp. Laws 1917, § 2053.

When the board of supervisors shall have completed their examination of the lands within the district and shall have made the determinations required of them they shall report their findings to the board of county commissioners. If the board of supervisors shall determine that "the costs and expenses of construction and maintenance and damages accruing are more than equal to the benefits which may inure to the lands in general of said district by reason of the proposed work, they shall so report, and the proceedings shall be dismissed at the cost of the petitioners." If, however, the work of draining and improving the lands within the district is to be carried out as contemplated, then the board of supervisors are empowered to conduct such work and to raise money with which to prosecute the same. We here set out in full the provisions of section 2055, Comp. Laws Utah 1917:

"The board of supervisors shall, on or before the first Monday of February of each year, prepare a statement and estimate of the amount of money to be raised by taxation within said district for the purpose of constructing canals, drains, drain ditches, and other works, and maintaining the same, paying the interest upon the bonded indebtedness of the district; creating a sinking fund for redeeming such bonds; and for the purpose of maintaining and repairing drainage canals, flumes, conduits, bridges, culverts, and other works within said district; and for the management and control of such drainage system; and shall assess the entire amount needed in each year against all of the land within said district in proportion to the benefits resulting to each tract of land by the construction and maintenance of such drainage system; the said board of supervisors shall view each tract of land within the district, and shall carefully consider all of the damages and benefits that each particular tract of land will receive from the construction and maintenance of such drainage system, and assess each tract of land in accordance with the benefits received by it, making proper allowance for damage, if there be any. After such assessment is made up, the secretary of the board of supervisors shall transmit the same to the board of county commissioners, and the board of county commissioners shall cause notice to be sent by mail to each land owner in the district of the amount of tax assessed upon the land owned by him within the district; and stating therein the time when and place where the board of county commissioners shall meet as a board of equalization to hear and determine complaints made against such assessments. The board of county commissioners shall sit as a board of equalization of district drainage taxes, and shall equalize and finally determine the assessments to be made and levied upon each tract of land within the district, at the time and in the manner provided for by law for equalizing state and county taxes, and shall thereupon certify the same to the county treasurer of the county within which such district is located; the county treasurer shall enter the same in the tax rolls in the county; and it shall be the duty of the county treasurer to collect such taxes at the time and in the same manner that the said county taxes are collected, and to pay the same to the treasurer of the board of supervisors as soon as moneys are received by him."

In 1919 the foregoing section was amended and other sections were added to the drainage law by chapter 41, Laws of Utah 1919. Section 2055, Comp. Laws Utah 1917, was amended to read as follows:

"The Board of Supervisors shall, on or before the first Monday in March of each year, prepare a statement and estimate of the amount

of money to be raised by taxation within said district for the purpose of constructing canals, drains, drain ditches, and other works, and maintaining the same; liquidating district warrants and notes and paying interest thereon, paying the interest on the bonded indebtedness of the district; creating a sinking fund for redeeming such bonds; meeting all payments due or to become due under any contract between the district and the United States; and for the purpose of maintaining and repairing drainage canals, flumes, and conduits, bridges, culverts and other works within said district; and for the management and control of such drainage system; and shall levy the entire amount required in each year against the lands within said district in proportion to the equalized benefits and after adding 15 per cent of each amount to the respective assessments to provide for incidentals and possible delinquencies, shall certify the same to the county assessor of the county within which such district is located."

Section 2054x5 was added to the drainage law. That section reads as follows:

"The Board of Supervisors shall, as soon as may be, view each tract of land within the district, and shall carefully consider all of the damages and benefits that each particular tract of land will receive from the construction and maintenance of such drainage system, and assess each tract of land in accordance with the benefits to be received by it, making proper allowance for damage, if there be any. After such assessment is made up, the secretary of the Board of Supervisors shall transmit the same to the Board of County Commissioners and the Board of County Commissioners shall within fifteen days after receipt thereof, cause not less than fifteen days' notice to be sent by mail to each land owner in the district of the amount of benefits assessed upon the land owned by him within the district; and stating therein the time and place where the Board of County Commissioners shall meet as a board of equalization to hear and determine complaints made against such assessments. The Board of County Commissioners shall sit as a board of equalization of drainage district benefits and taxes, and shall equalize and finally determine the assessments of benefits and taxes to be made and levied upon each tract of land within the district. Such assessments of benefits shall be the basis of lien upon the lands within the district for all district indebtedness."

One of the objections urged against the constitutionality of section 2055, chap. 41, Session Laws of Utah 1919, is that no provision is made therein or elsewhere in the drainage

law as amended for giving the taxpayer notice and an opportunity to be heard as to the amount and purposes of the tax which is levied against his property. It is earnestly contended that one's property may not be taken for either a tax or a special assessment unless and until ■ the owner of the property is given notice and an opportunity to be heard before a competent and impartial tribunal upon whether the amount is or is not fair and just, and as to the purpose for which the tax or assessment is to be used. In support of the principles of law thus contended for, plaintiff cites the following cases and authorities: Cooley on Taxation. Vol. 3 (4th Ed.) § 1119, p. 2264, § 1112, p. 2249, § 1113, p. 2252; *Kerr* v. *Woolley et al.*, 3 Utah 456, 24 P. 831; *Argyle* v. *Johnson*, 39 Utah 500, 118 P. 487; *State* v. *Corinne Drainage District*, 48 Utah 1, 156 P. 921; *Londoner* v. *City & County of Denver*, 210 U. S. 373, 28 S. Ct. 708, 52 L. Ed. 1103; *Hagar* v. *Reclamation District*, 111 U. S. 701, 4 S. Ct. 663, 28 L. Ed. 569; Kentucky Railroad Tax Cases, 115 U. S. 321, 6 S. Ct. 57, 29 L. Ed. 414; *Winona & St. Peter Land Company* v. *Minnesota*, 159 U. S. 516, 16 S. Ct. 83, 40 L. Ed. 247; *Lent* v. *Tillson*, 140 U. S. 316, 11 S. Ct. 825, 35 L. Ed. 419; *Glidden* v. *Harrington*, 189 U. S. 255, 23 S. Ct. 574, 47 L. Ed. 798; *Hibben* v. *Smith*, 191 U. S. 310, 24 S. Ct. 88, 48 L. Ed. 195; *Security Trust Company* v. *Lexington*, 203 U. S. 323, 27 S. Ct. 87, 51 L. Ed. 204; *Central of Ga. Ry. Co.* v. *Wright*, 207 U. S. 127, 28 S. Ct. 47, 52 L. Ed. 134, 12 Ann. Cas. 463; *Pittsburgh, C., C. & St. L. Ry. Co.* v. *Backus*, 154 U. S. 421, 14 S. Ct. 1114, 38 L. Ed. 1031; *Fallbrook Irrigation Dist.* v. *Bradley*, 164 U. S. 112, 17 S. Ct. 56, 41 L. Ed. 369; *Western Ranches* v. *Custer County* (C. C.) 89 F. 577; *Violett et al.* v. *City Council of Alexandria*, 92 Va. 561, 23 S. E. 909, 31 L. R. A. 382, 53 Am. St. Rep. 825; Burroughs on Taxation, 461; *State* (*Wm. Sigler, Prosecutor*) v. *Fuller, Collector, etc.*, 34 N. J. Law, 227; *Heth* v. *City of Radford*, 96 Va. 272, 31 S. E. 8; *Davidson* v. *New Orleans*, 96 U. S. 97, 24 L. Ed. 616; *People* v. *Cantor*, 190 App. Div. 512,

180 N. Y. S. 139; *Monticello Distilling Co.* v. *Mayor, etc., of Baltimore,* 90 Md. 416, 45 A. 210; *Hutson* v *Woodbridge Protection Dist. et al.,* 79 Cal. 90, 16 P. 549, 21 P. 435; *Stuart* v. *Palmer,* 74 N. Y. 183, 30 Am. Rep. 289; *Jewell* v. *Van Steenburgh et al.,* 58 N. Y. 85; *Ulman* v. *Baltimore,* 72 Md. 587, 20 A. 141, 21 A. 709, 11 L. R. A. 224. The cases cited support the principles of law urged by plaintiff. The defendants and interveners readily concede the law to be as announced in the cases cited, as well they may, because the principles of law so announced are so well established as to be beyond controversy.

The crucial question that divides the parties on this phase of this controversy is whether or not the plaintiffs have, in view of what has been done in the organization of the defendant drainage district, been given notice and an opportunity to be heard as to the tax which defendants seek to levy and collect on the lands within the district. Counsel for the defendants and interveners contend that when the amount of assessed benefits to each tract of land in the defendant drainage district was determined by the board of supervisors and equalized and fixed by the board of county commissioners the amount of benefits so fixed and determined became absolute and final, and that all taxes levied upon lands within the district must be based upon such assessed benefits. Thus it is urged that when the board of supervisors determined the amount of money that is necessary to meet the obligations of the district it becomes merely a matter of mathematical calculation to determine the amount of taxes that shall be levied upon each tract of land within the district. It seems to be the position of counsel for the plaintiffs that under the law as it existed when the defendant drainage district was organized the first assessment of benefits as determined by the board of supervisors and as equalized and fixed by the board of county commissioners was not final, but that such benefits should be determined and equalized annually as the basis for each tax levy. The language of section

2055, Comp. Laws Utah 1917, which we have heretofore set out in full in this opinion lends some color to the contention so made on behalf of the plaintiffs. A consideration of the entire act, however, will not permit of the construction contended for by them. There is no language in the drainage law that requires the board of supervisors to view each tract of land and fix the benefits thereon more than once. When the board of county commissioners sit as a board of equalization they "shall equalize and finally determine the assessments to be made and levied upon each tract of land." If the assessments are finally fixed it cannot be said that they are to be fixed from year to year. The taxes levied in each year shall be in proportion to the benefits resulting to each tract of land by the construction and maintenance of the drainage system. The benefits that result from the construction and maintenance are permanent in nature, and therefore there is no necessity for an annual determination of the amount of benefits. It is provided in section 2071, Comp. Laws Utah 1917, that "any property owner may pay the full amount of the benefit assessed against his property before such bonds are issued and receive a receipt in full therefor." The only conclusion that can be drawn from the language just quoted is that the Legislature intended that each tract of land within the district should be burdened with a lien to secure the payment of the costs of the construction of the drainage system to the extent of the benefits assessed on such tract of land. If the amount of the lien was to be subject to change from year to year it is highly improbable that the Legislature would have provided that such lien could be removed by the payment of a fixed amount. That bonds issued by a drainage district become a lien upon the land within the district is expressly provided for in section 2072, Comp. Laws Utah 1917.

The drainage law under which the defendant drainge district was organized has provisions for the issuance of bonds of the district and for incurring other indebtedness

for securing funds with which to construct the drainage system for the district. The amount of indebtedness which the district may incur is by the act limited by the amount of assessed benefits. Any indebtedness in excess of the assessed benefits is by the act declared to be absolutely void. It is difficult to conceive that the Legislature intended that either the board of supervisors or the board of county commissioners should be empowered to change the amount of the assessed benefits from year to year and thus render void obligations of the district which theretofore were valid. A drainage district founded upon such a law would find it extremely difficult, if not impossible, to dispose of its bonds or to secure credit or funds in any manner with which to meet its obligations. But one conclusion is permissible from a consideration of the entire drainage act as it was when the defendant drainge district was organized and as it now is, namely: That, when the board of county commissioners equalize and determine the amount of benefits that each tract of land within the district will receive by the construction of a drainage system, such determination is final and absolute, and neither the board of supervisors nor the board of county commissioners are authorized to change the assessed benefits so fixed and determined. This conclusion is in harmony with the views expressed by this court in *Argyle* v. *Johnson,* 39 Utah 500, 118 P. 487; *State* v. *Corinne Drainage District,* 48 Utah 1, 156 P. 921; *Campbell* v. *Millard County Drainage District* (Utah) 269 P. 1023; *Cottrell* v. *Millard County Drainage District,* 58 Utah 375, 199 P. 166. To construe the act otherwise would be to disregard some of the expressed provisions of the act, and would materially tend to defeat the results which the Legislature evidently intended to accomplish by the act. No complaint is made because the plaintiff and other owners of land within the defendant drainage district did not have proper notice and ample opportunity to be heard before an impartial tribunal as to the amount of benefits that should be assessed to each tract

of land within the district. The stipulated facts show that all owners of land within the district had notice and an opportunity to be heard. Thus, under the provisions of our drainage act all assessments levied against the land within the drainage district must be in proportion to the assessed benefits, and such assessed benefits may not be changed. Therefore it follows that when the amount of funds necessary for a district to raise in any given year to meet its needs is determined, the amount of annual assessments that must be levied against such tract of land becomes a mere matter of mathematical computation. With the proportion of taxes that must be assessed to each tract of land within a drainage district permanently fixed, the amount of taxes levied against each tract of land can be changed only as the total amount of taxes sought to be collected is changed. If, therefore, the drainage law under review is to be held unconstitutional because of lack of proper provisions therein for notice and an opportunity to be heard, such holding must be founded upon the theory that the landowners within the defendant district are entitled, under our Constitution, to notice and a hearing upon the question of the amount of money that is necessary to be raised by taxation to meet the obligations of the district before such tax may be legally levied and collected. The provision of our Constitution that one's property may not be taken without due process of law is not so exacting. When the owners of land within the boundaries of defendant drainage district received notice of the various steps taken in the organization of the district, and notice and an opportunity to be heard as to the amount of assessed benefits to their land, they were charged with notice of the law as it existed at that time, of the liability of the land within the district to be taxed to an amount equal to the assessed benefits, and of the means provided by law for the assessment and collection of taxes. When taxes are assessed and collected for the purpose and in the manner that the owners of the land in the district knew they would be assessed and col-

lected at the time they organized the district, and at the time they bonded the district, and the district is lawfully organized and the bonds lawfully issued, it is difficult to conceive why they should be heard to complain because they were not given notice and an opportunity to be heard before taxes are so assessed and collected.

A drainage district is one form of municipal corporation. It may be worthy of note that at the time our Constitution was formed, as well as before and since that time, municipal corporations have raised money by taxing the property within the municipality. It is a matter of common knowledge that city councils of cities, boards of education of school districts, county commissioners of counties and the proper officers of other municipalities are empowered to raise funds by taxing property within the municipalities. So far as we are informed it has never been the practice in this state to give a taxpayer notice and an opportunity to be heard as to the amount of taxes that shall be raised in a given year for municipal purposes before such taxes are levied and collected, unless it can be said that the act providing for a budget system is such a law. Laws of Utah 1927, chap. 54, p. 80. That act does not apply to drainage districts. The amount of taxes that must be levied for some purposes, such as providing for the payment of bonds, is frequently fixed by law. The drainage law has such a provision. Obviously, when the law fixes the amount of tax that must be levied there is no occasion for notice and a hearing. If taxes are not levied and collected as provided by law, or if the taxes collected are not properly applied to municipal purposes, the taxpayer has recourse to the courts for the protection of his rights. The drainage law, particularly section 2055, does not offend against the Constitution of this state in that it makes no provision for notice and an opportunity to be heard as to the annual assessment of lands within the district in view of the other provisions of the drainage law. The constitutional requirement that a property owner is

entitled to notice and an opportunity to be heard before his property may be taken is sufficiently met by the provisions of our drainage law, whereby all property owners within a drainage district are given notice and an opportunity to be heard as to the organization of a drainage district, and as to the amount of benefits that each tract of land within the district will receive by the construction of the drainage system. This conclusion finds support in the statement of the law in Page and Jones on Taxation by Assessment, vol. 2, at page 1264, where it is said:

"If a valid legislative determination has settled certain facts, and the amount of assessment is to be determined from the facts already ascertained by mere mathematical computation, notice and hearing are not necessary as to such computation since the rights of the parties could not in such case be affected by evidence adduced at the hearing."

A list of cases which support the text are collected in footnotes.

It is next urged that section 2055, Comp. Laws Utah 1917, as amended by chapter 41, Laws Utah 1919, is unconstitutional, because when the board of supervisors shall determine the amount of money that is to be raised by taxation during any given year 15 per cent shall be added to such amount to provide for incidentals and possible delinquencies. The constitutionality of that provision which authorizes the levy of an additional 15 per cent is assailed upon two grounds, namely: That such provision takes from the property owner who pays his taxes money with which to pay taxes of the person who fails to pay; that, when the bonds of a district are issued and other indebtedness incurred, contracts result whereby the property owners obligate themselves to pay only their proportion of the bonds or other indebtedness of the district, and that a law which requires them to pay an additional 15 per cent in effect impairs the obligation of contracts which were entered into before the law was amended. It will be observed that section 2055, before it was amended in 1919, contained no express provision for the addition of 15 per

cent to provide for incidentals and possible delinquencies. That section, however, as it was before the amendment, contained a provision that the board of supervisors of the district should "assess the entire amount needed in each year against all of the land within said district in proportion to the benefits resulting to each tract of land by the construction and maintenance of such drainage system." It is a matter of common knowledge, of which we may take judicial notice, that it is rare that all property owners within a taxing unit promptly pay their taxes. If a municipality desires to meet its obligations promptly and thus preserve its credit, and the advantages incident to an established reputation for prompt payment, some provision must be made to temporarily care for the deficiency of funds occasioned by the failure of some of the property owners to pay their taxes. There is no language in section 2055, as it was when the drainage district was organized, which is susceptible of the construction that boards of supervisors of drainage districts are limited in their annual tax levy to such a levy as, if all paid, will supply the needed funds. On the contrary, the board of supervisors by section 2055, as it existed before the amendment of 1919, is required to raise the needed funds by an annual tax levy upon the lands within the district. The board of supervisors might properly, under the provisions of section 2055, as it was before it was amended in 1919, consider, in making up the levy, the fact that some of the taxes would not be promptly paid. The only effect of the amendment made in 1919 to section 2055 was to make certain and definite the amount the board of supervisors should add to provide for contingencies and delinquencies. Nor can it be said that the addition of 15 per cent for contingencies and delinquencies will result in one landowner paying the tax of other landowners who do not pay. Land upon which the tax is not paid is not, under the act, relieved from a tax lien by the failure to pay, but the land must eventually be sold for the taxes levied if they are not paid. If any land within the district is sold because

the drainage tax thereon has not been paid, it is to be presumed that the drainage district will derive from the land so sold sufficient funds to pay the taxes and thus eventually the drainage district will be made whole and no landowner within the district will pay more than his just proportions of the costs and expenses of the construction and maintenance of the drainage system. If a landowner within a drainage district fails to pay his taxes and suffers his land to be sold, it cannot be said that he thereby derives any advantage over the other landowners within the district. There may be instances where the sale of land for drainage taxes will not produce sufficient funds to pay the drainage taxes levied against it, but that is a result incident to all forms of taxation and the loss of necessity must be borne by other taxpayers, so long as the taxpayers are not required to pay more than the amount of the assessed benefit to their respective tracts of land. The drainage law of 1917, section 2072, reads as follows:

"Whenever any such drainage district bonds shall be issued in accordance with the provisions of this title, such bonds shall constitute a lien upon all of the lands and improvements thereon within the boundaries of the district, and the board of supervisors of said district shall, from time to time, as hereinafter provided, levy a sufficient tax to pay the annual interest charge on such bonds, and, in addition thereto, such an amount as a sinking fund which shall, in the course of events and ultimately, amount to a sufficient sum to redeem said bonds."

The foregoing section was amended by chapter 47, Laws of Utah 1921, page 136, to read as follows:

"Whenever any such drainage district bonds shall be issued, or contract with the United States made, in accordance with the provisions of this Act, such bonds, or contract, shall constitute a lien upon all of the lands and improvements thereon within the boundaries of the district, to the extent of the total benefits, assessed and equalized, and pledged for such purpose, and not in excess thereof, and the board of supervisors of said district shall from time to time, as by this Act provided, levy a sufficient tax to pay the annual interest charge on such bonds, and in addition thereto, such an amount as a sinking fund which shall, in the course of events and ultimately, amount to a suf-

ficient sum to redeem said bonds, or in case of contract with the United States, shall levy a sufficient tax to meet all payments due, or to become due thereunder, and in addition thereto, a sufficient tax to pay the interest or penalties on any delinquent payment or payments, as provided in said contract or as required by the statutes of the United States."

It will be seen that the extent of the lien provided for in section 2072, Comp. Laws Utah 1917, is not by the language of that section made definite, but when that section was amended in 1921 it was definitely fixed at the amount of assessed and equalized benefits. When section 2072, Comp. Laws of Utah 1917, is read and considered in connection with other provisions of the drainage law as it then existed, the extent of the lien to secure the payment of bonds of the district was the same before as it was after that section was amended. Thus, section 2073, Comp. Laws Utah 1917, provides:

"Each bond issued as provided for by § 2071 shall be signed by the president and the secretary of the said board of supervisors, and be attested by the county clerk, and said clerk shall also make a certified statement thereon, affixing his seal of office thereto, of the total amount of the assessments and rate of interest it bears, pledged for the payment of said bonds and other bonds, if any, issued; the date, number, denomination, and time due of all bonds issued which are a lien upon the assessments, or instalments of assessments of the district; when the assessments were confirmed by the county commissioners, and the number of acres of land in the district against which said assessments were made."

Attention has heretofore been called to the provisions contained in section 2071, Comp. Laws Utah 1917, permitting any property owner within a drainage district to pay the amount of benefits assessed against his property and thus relieve his property from all bond liens. These and other provisions of the drainage law as contained in title 26, Drainage Districts, Comp. Laws Utah 1917, make it reasonably clear that the Legislature intended that bondholders of a drainage district should have a lien for the payment of their bonds to the amount of, and not beyond,

the benefits assessed against each tract of land within the district. The conclusion thus reached is in accord with the views expressed by this court in the case of *Cottrell* v. *Millard County Drainage District* and *Campbell* v. *Millard County Drainage District,* supra. The case of *Nelson* v. *Board of Commissioners of Davis County,* 62 Utah 218, 218 P. 952, is cited by plaintiffs in support of their contention that 15 per cent may not be added to the tax levied to provide for incidentals and possible delinquencies. That case involves the construction of the law relating to irrigation districts. The law relating to irrigation districts is so unlike the law relating to drainage districts that a judicial construction of the one is of but little aid in the construction of the other. If, however, the addition of the 15 per cent to the tax levied should result in any landowner being required to pay a tax in excess of the benefits assessed to his land for the construction of the drainage system, the principles of law announced in the Nelson Case might well apply to the drainage law. Such, however, is not this case. No claim is made that any of the plaintiffs have paid or by the payment of the tax involved in this controversy will have paid the full amount of the benefits assessed against their lands. It will be observed that the defendant drainage district has outstanding matured obligations in the total sum of $1,039,756 and an additional $85,000 of obligations will mature before the tax sought to be collected can be available. If all of the taxes, including the added 15 per cent to cover possible delinquencies and incidentals, are paid in full, the district will realize only the sum of $180,583.04. Under the drainage law the board of supervisors of the defendant district is authorized to levy a sufficient tax to meet the needs of the district. The assessment complained of by the plaintiffs falls far short of measuring up to the needs of the district if its matured obligations are to be paid. Thus, if the 15 per cent added to provide for possible delinquencies and contingencies had been added to the amount levied for the other purposes mentioned in the

resolution without designating that such additional amount was to provide for possible delinquencies and contingencies, such levy would clearly be authorized under the stipulated facts. Under such circumstances it is difficult to perceive why plaintiffs have any just cause to complain because of the tax levy here in question. When the defendant drainage district was organized each tract of land within the drainage district became security for the payment of the obligations of the district to the extent of the benefits assessed against it. The creditors of the district have a right to resort to such security for the payment of their claims, and the board of supervisors are authorized to levy and collect sufficient taxes to pay such creditors to the extent of the assessed benefits.

It is further urged that the drainage district was not authorized to issue $200,000 of tax anticipation notes, and therefore a tax may not lawfully be levied to pay the same. Laws of Utah 1921, sec. 2060, p. 135, c. 47 grants the board of supervisors authority to borrow money and incur indebtedness "not exceeding the taxes for the current year, and as evidence of such indebtedness may issue warrants or negotiable notes of the district payable in not more than one year from date thereof, and bearing interest not exceeding 8 per cent per annum." The stipulated facts show that the tax anticipation notes which the district seeks to pay from the funds derived from the tax levy bear interest at the rate of 5 per cent per annum, while the interest coupons in payment of which the tax anticipation notes were given bore interest at the rate of 6 per cent per annum, after maturity. Thus, by the issuance of the notes to take up the interest coupons, the district secured the advantage of a lower rate of interest. Obviously, the defendant drainage district may not repudiate its tax anticipation notes and also avoid paying the interest coupons for which the notes were given. That part of the tax which the defendants seek to levy and collect for the payment of the tax anticipation notes is, in effect, a tax

for the payment of interest on the bonds of the district—an obligation which the defendant drainage district undertook to pay when the bonds were issued. That such a tax may be levied is not open to serious doubt.

The writ of prohibition is denied, and the defendants are directed to proceed with the collection of the tax levied by the resolution of the board of supervisors. Defendants and intervenors are awarded their costs.

CHERRY, C. J., and STRAUP, EPHRAIM HANSON, and FOLLAND, JJ., concur.