# BOTHWELL v. SALT LAKE COUNTY DRAINAGE DIST. NO. 2.

No. 5437.  Decided January 5, 1935.  (39 P. [2d] 737.)

*Irvine, Skeen & Thurman,* of Salt Lake City, for appellant.

*Riter & Cowan,* of Salt Lake City, for respondent.

BATES, District Judge.

The complaint upon which plaintiff's cause of action is based alleges in substance that plaintiff is the owner of certain large tracts of land; that the defendant is a drainage district organized under the laws of the state of Utah; that the first board of supervisors, after qualifying as required, determined the damages and benefits that each tract of land within the district would sustain from the construction and maintenance of a proposed drainage system, and assessed each tract of land including the parcels owned by plaintiff in accordance with the benefits to be received by it; that plaintiff paid the assessments levied for the years 1923, 1924, 1925, 1926, and refused to pay the assessments levied for the years 1927, 1928, 1929, and 1930; that soon after the proclamation of the organization of the district, the supervisors employed competent engineers who examined the lands and presented to the board definite and fixed plans for the construction of the drainage system; that the plans so fixed provided for the construction of three lines through the lands within the district, one of which traversed the lands owned by the plaintiff; that the system, as provided for, would have given plaintiff's lands adequate drainage; that the defendant caused two of the lines provided for to be constructed, but refused to construct the third line which would have passed through plaintiff's lands, and that, as a result, plaintiff's lands have been deprived of adequate drainage; that plaintiff paid the assessments levied for the years 1923, 1924, 1925, and 1926, relying upon the agreement that the defendant district would construct the drainage system as provided for in the plans as fixed by the engineers, and that he refused to pay the assessments levied for the years 1927, 1928, 1929, and 1930, for the reason that the district breached its agreement to construct the drain through his lands; and that said assessments now appear as a lien and cloud upon plaintiff's lands. The prayer of the complaint is that said liens be declared void and plaintiff's title be quieted;

that plaintiff have judgment for the moneys paid; and that the lands be excluded from the district.

At the commencement of the trial, the defendant objected to the introduction of any evidence for the reason that the complaint did not state a cause of action. The objection should have been sustained.

The statutory provisions governing the organization and operation of drainage districts have been quoted at length in *Elkins* v. *Millard County Drainage Dist. No.* 3, 77 Utah 303, 294 P. 307, to which case the reader is referred to for a more exhaustive study of the legislative action.

There is no complaint that the district was not duly and regularly organized; neither is there any complaint that the assessments as made were not fair and equitable. All the allegations of the complaint are to the contrary. There is an allegation by way of inference to the effect that the defendant agreed with the plaintiff to construct line No. 3 which is the line through plaintiff's lands and that because of the breach of the agreement he refused to pay the assessments now complained of. But it must be apparent even to a lay mind that there was no agreement under the allegations of the complaint which could have been the basis of these assessments. It is clear from the complaint that plaintiff's lands were originally included in the district and that it was not until after the district had been finally organized and the proclamation of organization published that the engineers were employed who finally recommended the construction of the line through plaintiff's lands. If there is any contractual relation involved under this pleading, it must be the relations between the landowners and not the relation between one of the landowners and the district created upon their application.

But if we should overlook the insufficiency of the pleadings and look to the evidence, plaintiff can fare no better The following facts are either stipulated or appear in the record undisputed:

The defendant is a drainage district organized under leg-

islative authority in the year 1922, including within its boundaries approximately 7,000 acres. The plaintiff owned nearly 700 acres of the land in the district, and for three years after its organization acted as one of the supervisors appointed by the county commissioners. The organization of the district is regular and the benefits to be derived from the construction of a drainage system were determined and finally fixed in the way provided by the statute. Plaintiff made no objection to any of these proceedings, but, on the other hand, took an active part in the organization of the district and in the determination of the benefits that would accrue to the various tracts of land affected. The original proceedings contemplated the construction of two main drain lines. After the formal organization of the district, the appointment of the supervisors and the final determination of the benefits the lands would receive from the construction of the drainage system, engineers were employed to make an accurate study and survey to determine in detail the system of drainage to be installed. These engineers recommended and the supervisors approved a system including what has become known as drain No. 3, which was intended to be laid through the lands belonging to the plaintiff and some other landowners in the district. Thereafter a contract was entered into with Salt Lake City for the construction of the two main drains outlined in the original proceedings, and the work completed in 1927. For this work and other operating expenses of the district there is and was, at the commencement of this action, an indebtedness of more than $40,000. Drain No. 3 has not been constructed and, as a result, plaintiff's lands have not in fact been materially benefited by the system as now constructed. Plaintiff ceased to act as a supervisor in 1925. He paid the benefit assessments levied against his lands for the years 1923, 1924, 1925, and 1926, but refused to pay the assessments levied for the years 1927, 1928, 1929, and 1930, amounting to nearly $3,000. Other landowners not parties to this action, whose lands would be particularly benefited by the construction of the No. 3 line,

have also refused to pay their assessents for a number of years prior to the commencement of this action. The delinquent and unpaid assessents levied on the lands within the district during the years 1923 to 1928 exceeded $23,000. The estimated cost of completing the district is $7,000.

The record does not justify a finding that the defendant district either abandoned or refused to construct the unfinished portion of the system as outlined by the engineers unless it follows, as a matter of law, that a failure to construct because the necessary finances were not available as a result of plaintiff and other landowners refusing to pay the assessments levied from year to year amounts to a refusal or abandonment. That the supervisors at all times intended to complete the work is conclusively demonstrated by the following excerpts of the minutes of the board read into the record by the plaintiff:

Counsel for plaintiff read into the record a paragraph of the annual report of December 4, 1925, which authorized the engineers to revise the plans and specifications and date for building the main west drain and high line laterals on the west side of the river and branch laterals at the south end of the west side laterals and reported further that notice had been published, bids had been received, but the district was unable to sell its warrants or unable to show financial ability to satisfy the contractors to go ahead. The report contained the further provision that it was thought best by the present majority of the board of supervisors to try to validate the bonds and re-establish the credit of the district so the drainage system could go on. Mr. Riter, for the plaintiff, read further from the report of the board of supervisors dated December 2, 1926, to the effect that a relatively small amount of work remained to be done in the way of extending the drainage system and that up to the present time the district had been unable to finance this work, but that plans were being worked out whereby it hoped that satisfactory arrangements might be made to complete all construction work in the near future, and, further, that an

annual assessment of $6,210 had been levied and it was thought by this, with the decreased delinquencies and the fact that the period of redemption was expiring, would increase the cash returns to the district. The report further showed that the district had collected in 1925 approximately $3,700 and expended approximately $3,000. The report of December 1, 1927, was read in part to the effect that on January 29, 1925, the Salt Lake County Drainage District No. 2 had entered into a contract with Salt Lake City purchasing right of way to carry drainage waters through canals to be constructed by Salt Lake City through the drainage district; that the drains on both sides of the Jordan river had been completed by the district and were functioning satisfactorily; that difficulties were being had to get free rights of way and that a relatively small amount of work remained to be done by the district, this work consisting of extending drains to the landowners whose properties did not lie close to the main canal; that the district had endeavored to finance this work, but had been unable to do so and was hampered by large delinquencies, which it was thought would clear up because the period of redemption on land sold for taxes was about to expire; and that the collections and cash balance for the period January to July, 1927, showed $5,176.26 with total disbursements of $3,743.

Counsel for plaintiff then read from the minutes of the board of supervisors of February 28, 1928, to the effect that the Salt Lake Pressed Brick Company had considered furnishing the tile for the drainage and that they had considered doing this and taking anticipation notes and warrants and further stating that the matter of completing the construction work was discussed and the engineer was requested to make recommendations as to revising the size of the tile to be used for the west branch canal and it was resolved that the contract for building the west branch canal be awarded to Sommer-Baer Drainage Company, provided the company would accept tax anticipation notes.

Counsel for plaintiff read further from the minutes a

resolution fixing the amount to be raised by taxation in the year 1928 as $11,712.52. The minutes showed this resolution unanimously adopted.

Counsel then read from the annual report dated December 1, 1928, excerpts in part to the effect that while the greater part of the drainage district work had been completed and a small amount, consisting of extending the drainage system, for the completion of which negotiations had been under way with Sommer-Baer Drainage Company, and that early in 1928 it was decided that the remainder of the main drainage work should be done by laying various branch lines on both sides of the river to reasonably serve all lands in the district and that the contract be awarded to Sommer-Baer Drainage Company on its bid submitted, providing it would accept tax anticipation notes of the district and provided that a definite agreement be made with the Utah Reclamation Company for payment of its delinquent assessments. The report further recited that for the purpose of raising sufficient money to finance the completion of construction work, the board had decided to levy a greater amount of taxes and had resolved to make a levy for the year 1928 of the sum of $13,469.39, and that because the district had no funds with which to complete its system and the further fact that the Sommer-Baer Drainage Company had refused to accept anticipation notes, the further construction work had not been commenced but it was thought that the increased levy for 1928 and 1929 would produce sufficient revenue to pay for the construction work in cash and save interest to the district on anticipation notes.

Counsel read further from the report to the effect that commencing with 1928 the financial condition of the district should improve because a large number of delinquencies would have to be taken care of or go to tax deed. The statement further showed receipts in the sum of $7,198.19 with disbursements of $6,503.91, leaving balance of $694.26.

Counsel read from the annual report of December 2, 1929, to the effect that in view of the large number of complaints

against the tax levy being so high, it was thought that a smaller levy for 1929 would revive the interest of the landowners and accordingly a levy of $4,202.40 was made.

While there are as usual numerous incidental questions suggested in the abstract and briefs of the respective parties, the real question for our determination is whether, in view of the foregoing facts, the court has power to order the lands of the plaintiff segregated from the district and relieved from the incidental burdens.

The real purpose of the law is to enable landowners to band together for the purpose of reclaiming lands burdened with excessive water and to determine in advance the fair and equitable contribution the respective landowners should be required to make for the joint enterprise. For that purpose the law provided that after the district is organized appraisers should go over the land and, after full study of the varying conditions so far as they could be determined in advance, fix the relative benefits. These benefits so determined were to be reported to the county commissioners who, after notice to every landowner, were to sit as a board of equalization, hear complaints or disputes, and, after full hearing, finally determine what the benefits in fact would be. The order made by the commissioners, after such hearing on the relative benefits, is declared by the legislative enactment to be final and is fixed as the basis upon which taxes may be levied from year to year for the purpose of meeting the obligations of the district. When obligations are incurred, the only recourse of the creditor is against the respective tracts of land to the extent of these benefits. Not only does the statute so provide, but this court, in a number of decisions, has so held. Laws Utah 1919, c. 41, p. 94, § 2054x5, provides:

"* * * The Board of County Commissioners shall sit as a board of equalization of drainage district benefits and taxes, and shall equalize and finally determine the assessments of benefits and taxes to be made and levied upon each tract of land within the district. Such assessments of benefits shall be the basis of lien upon the lands within the district for all district indebtedness."

In *Elkins* v. *Millard County Drainage District No. 3*, 77 Utah 303, 294 P. 307, 312, this court said:

"But one conclusion is permissible from a consideration of the entire drainage act as it was when the defendant drainage district was organized and as it now is, namely: That, when the board of county commissioners equalize and determine the amount of benefits that each tract of land within the district will receive by the construction of a drainage system, such determination is final and absolute, and neither the board of supervisors nor the board of county commissioners are authorized to change the assessed benefits so fixed and determined. * * * To construe the act otherwise would be to disregard some of the expressed provisions of the act, and would materially tend to defeat the results which the Legislature evidently intended to accomplish by the act."

In *Campbell* v. *Millard County Drainage District*, 72 Utah 298, 269 P. 1023, 1025, this court said, in referring to the foregoing and other statutes:

"While these amendments clarify and emphasize the matter referred to, they add nothing, because the act before amendment is capable of no other interpretation than that it was intended to authorize the levy and collection of taxes for district purposes in amount within the limits of the benefits assessed and determined, and that the rule must apply in each individual case as well as the aggregate. To say that one landowner in the district should be taxed beyond the benefits received by him to pay for the default of another offends not only against justice and reason, but is repugnant to constitutional guarantees."

In the Campbell Case an attempt was made to make the bonds owned by plaintiff a general obligation against the district and to have assessments levied against the lands in excess of the determined benefits. But that can make no difference to the principle involved. In that case the attempt was to directly place additional burdens upon the lands; in this case the attempt is to relieve a portion of the lands within the district from their burden, and by indirection place additional burdens upon the remaining lands.

Should plaintiff prevail, other landowners whose lands would be benefited by the construction of the No. 3 line, and

who have also refused to pay their assessments, might well ask for the same relief. How many more there might be cannot be told from this record, perhaps none. But it is apparent that if after a district is organized and the relative benefits determined and fixed, thereby limiting the rights of creditors, this court upholds an order preventing the supervisors from levying assessments on part of the lands in the district, it will, to that extent, lessen the security of the creditors for the return of their money, and a continuation of the policy would fritter away the power of payment. In this regard, the situation is materially different from a municipal corporation with general obligations outstanding.

Great stress is laid by counsel upon the fundamental proposition of law that where property is taken for public purposes through taxation in excess of benefits conferred, that it is unconstitutional and void. There is no quarrel with the provision. The quandry in which plaintiff finds himself is that these benefits have been determined by a properly constituted authority with full notice and opportunity to be heard, and with himself taking an active part in all the proceedings. The taxes which he refuses to pay and from which he desires final relief are levied against the benefits which he himself, together with the other duly authorized parties, fixed after full and complete study. There can be no question but that if he were dissatisfied, it was his duty to object when the benefits were being determined, and if he was still dissatisfied with the action of these duly constituted authorities, then appeal to the courts within the prescribed time fixed by the Legislature. That the provisions of the statute and the proceedings had in the organization of this district, and the determination of the benefit assessments gave to the plaintiff every opportunity to be heard that the law contemplates is evident.

In *Argyle* v. *Johnson*, 39 Utah 500, 118 P. 487, 490, this court, in considering the sufficiency of notice and hearing, says (quoting from an opinion of Justice Frick) :

"In giving legal effect to the foregoing principle in cases like the

one at bar, it is not necessary that a hearing be had at any particular stage of the proceeding by which rights may be affected, or that the hearing be had before a regularly constituted court of justice; but it is necessary that a hearing be given at some time, and that the same be had before some officer, tribunal, board, or court to whom the person whose property is affected may present his evidence, objections, and arguments, to the end that the officer, tribunal, board, or court may be enabled to fairly and intelligently pass upon and determine the questions presented for decision."

The law under which the district was organized provides for such hearing after notice, with the power of determination and final appeal to the courts in the event of dissatisfaction. The stipulation that the law was fully complied with when considered in connection with the provision of the law that the decision of the commissioners sitting as a board of equalization is final, necessarily leads to the conclusion that the plaintiff is bound by the finding of the commissioners as to the benefits conferred.

None of the cases hold or suggest that because the lands within a district do not in fact receive the benefits originally determined, that a court has power to order them withdrawn from the district. Neither is there any suggestion in any of the cases that because the district has not completed the system as originally contemplated that a court of equity should relieve the lands of their burden.

Undoubtedly, if the supervisors of a drainage district neglect to construct a necessary part of a drainage system, and as a result some of the lands are not benefited, there should be relief because of the injury, but withdrawal of the lands from the district is not the proper remedy. Mandamus may be. If plaintiff's theory that the construction of No. 3 was an essential part of the system as originally contemplated, then it follows that the failure to do so is a neglect of duty for which mandate would lie. But if the construction was discretionary with the supervisors, then certainly plaintiff would have no standing in court for the relief now demanded.

In *People ex rel. Dorris* v. *Garner,* reported in 275 Ill. 228,

114 N. E. 27, at page 30, where there was being considered the right of landowner to prevent a sale of property because of insufficiency of the drainage system, the court says:

"* * * It is not enough to show that the property has not yet received that amount of benefits. It is sufficient if it will receive the benefits from the improvement when completed. Inadequacy of outlet is not sufficient to justify the refusal of judgment unless it appears that the outlet cannot be made adequate for an amount equal to the benefits to the land affected. * * * The provisions of the Farm Drainage Act requiring drainage commissioners to provide outlets of ample capacity for the waters of the district are mandatory, and land owners who have been assessed for the purpose of constructing drains or ditches to drain their lands may compel the commissioners to deepen and widen the outlet so as to provide main outlets of ample capacity for the waters. * * *"

In *Surrage* v. *McKay*, 60 Utah 117, 206 P. 722, 725, this court, in considering the questions as to whether or not the board of directors of an irrigation district should be enjoined from exercising any corporate privilege because of their failure to comply with the statute permitting them to commence special proceedings to judicially examine and confirm the proceedings had in the organization of the district, says:

"If it were held, however, that the statute is mandatory, and thus made it the duty of the board of directors of the district to institute the proceeding, nevertheless, the appellants would have a plain, speedy, and adequate remedy against the board of directors. They could compel the performance of the duty by filing an application for a writ of mandate, and thus coerce the board to discharge its duty. * * *"

The statute, R. S. Utah 1933, 104-68-2, provides:

"It may be issued by the supreme court, or by a district court or a judge thereof, to any inferior tribunal, or to a corporation, board or person, to compel the performance of an act which the law specially enjoins as a duty resulting from an office, trust or station. * * *"

If we assume that it is plaintiff's right to demand the construction of No. 3, then it follows that all the resources of the district must be used for that purpose, and it becomes

the duty of the supervisors to levy such assessments from time to time as may be necessary for such purposes unless it can by the use of its credit raise the necessary money in some more convenient way. If they fail or refuse, then by proper proceedings they could be compelled until the resources of the district have been exhausted.

It cannot be said under the record of this case that the construction of line No. 3 was impossible because of lack of finances. The most that can be said is that the supervisors were unable to sell the bonds of the district for the necessary revenues with which to complete the work; that they could not get the work done by the use of their tax anticipation notes; and that they had been unable to secure enough money by the levying of assessments for their purposes. They had levied the necessary assessments with the intention of completing the project, but the landowners, including plaintiff, had failed to pay their respective portions. It thus became their duty to sell the property as provided. These things could not be speedily done. Delay necessarily followed, but that does not amount to abandonment nor refusal to proceed.

The record shows that 7,000 acres of land were pledged to the performance of this work and payment therefor to the amount of the assessed benefits, $40 per acre or about $280,-000. The evidence is to the effect that the land, when drained, has a reasonable value of $50 per acre. It is going too far to assume that enough money cannot be collected by the assessment and sale of these lands to complete the system, although there may be delay where the supervisors are compelled to resort to the method of sale for collection as provided by the statute.

But if the completion of the district is impossible for inability to finance the remainder of the work, it does not follow that part of the land should be relieved from the burdens of the enterprise. Such a condition would demonstrate the necessity of retaining the lien upon all the lands for the protection of the creditors who have ac-

cepted the obligations of the district relying upon their statutory liens.

The landowners banded together and assumed mutual responsibilities. Each of them is entitled under the relationship as originally formed to have the other carry his portion of the burden. As pointed out in the decisions of this court, neither the supervisors nor the commissioners have the power to relieve a landowner of these burdens. To permit it would be to destroy alike the rights of creditors and of the associated landowners. For a court to compel them to do what they have no right under the law to do would be to make the court an instrument of injustice. Much more grievous would be the error, if in a case like this, where neither landowners nor creditors are parties, the courts were to relieve parts of the lands from the responsibilities that were assumed, and thereby either increase the burden upon the remaining lands or destroy the power of creditors to collect.

Plaintiff was one of the largest landowners in the district. He was also a man who had taken an active interest in the organization of the district, and, as a supervisor, had executed the contract with the city for the improvements that were installed. He knew that the estimated cost of the construction of the drainage system was in excess of $70,000; that approximately six-sevenths of the work had been completed; that the cost of construction had been only about one-half of the original estimates because of a favorable contract with Salt Lake City; and that it required only a few thousand dollars more to complete the system. There is much evidence in the record to justify the conclusion that there had been a substantial benefit to the lands of the district, and that the values of the lands were materially enhanced.

With full knowledge of all these things, plaintiff deliberately refused to pay his portion of the taxes or assessments levied by the supervisors. It seems to the writer there can be no question that for a man in his position and with the influence he had in the community as displayed by the record,

to refuse to meet his obligation could not but have influenced others to follow his example. By his conduct he deliberately tied the hands of the supervisors, and then, because he had them helpless, he asks the court to approve his action in declaring an abandonment of the project. That would be to permit him to profit by his own deliberate wrong.

If the district as a whole is unable to raise funds with which to pay for installing a $7,000 improvement which under all the evidence would materially enhance the values of the properties in the district, then it becomes pertinent to ask how thew are going to raise the money with which to pay more than $40,000 indebtedness if a large part of the securities are withdrawn from the operation of the taxing power. Although the creditors are not now before the court, yet in determining the rights as between these parties we cannot avoid considering the purpose of the law in determining the proper construction. Neither can we shut our eyes to the necessary results that must follow should we hold that the court can upset the benefit assessments upon which contractual rights are predicated.

The following language used by Justice Hansen in the Elkins Case is applicable:

"The drainage law under which the defendant drainage district was organized has provisions for the issuance of bonds of the district and for incurring other indebtedness for securing funds with which to construct the drainage system for the district. The amount of indebtedness which the district may incur is by the act limited by the amount of the assessed benefits. Any indebtedness in excess of the assessed benefits is by the act declared to be absolutely void. It is difficult to conceive that the Legislature intended that either the board of supervisors or the board of county commissioners should be empowered to change the amount of the assessed benefits from year to year and thus render void obligations of the district which theretofore were valid."

The very pupose of providing for the creation of drainage districts was to make it possible to raise funds for reclamation purposes by making certain and definite the relations

between the various landowners and the persons with whom they may have business relations. Without such certainty men would not organize for such purposes; neither would others engage in business relations with a district having no definite and certain basis upon which to raise funds to meet their business commitments. The language of the act justifies and requires the construction that when the benefits to a given tract are determined in the manner provided, that such determination is final. There is nothing in the pleadings that in any way suggests any failure to comply with the requirements of the law in determining the benefits, and the stipulations of the respective parties definitely fix that all the proceedings were regular. There is no evidence from which it can be inferred that the district intended to abandon the construction or any part of it excepting as it may be inferred from possible inability to finance without selling the lands of the district. That as heretofore pointed out is insufficient to justify granting the relief prayed for.

Defendant cannot recover on its counterclaim. The statute provides a method of levying and collecting assessments. That method must be followed.

Judgment is reversed, and the cause remanded to the district court with directions to enter judgment in favor of defendant on plaintiff's complaint. Costs to appellant.

ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

MOFFAT, J., being disqualified did not participate herein.

STRAUP, C. J., did not participate herein.